# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JOVAN E. DANOVE | CIVIL ACTION |
| VERSUS | NO: 11-3173 |
| RAUL DAVILA, INDIVIDUALLY, AND IN HIS OFFICIAL CAPACITY AS SUPERVISOR, AND MIKEN SPECIALTIES, LTD. F/K/A BROCK SERVICES, LTD., AND ITS INSURER ABC INSURANCE COMPANY | SECTION: "S" (1) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, Jovan E. Danove, was employed by defendant, Miken Specialties, Ltd., as a laborer building scaffolding. On December 29, 2011, Danove brought this suit against Miken and her former supervisor, Raul Davila, in the United States District Court for the Eastern District of Louisiana alleging claims of sex discrimination and retaliation for refusing to entertain Davila's sexual advances. Miken moved to dismiss the case or stay it pending arbitration, arguing that, as a condition of her employment, Danove signed a broad arbitration agreement on January 14, 2011, that encompassed her claims. Although the document is dated January 14, 2010, Miken claims that Danove mistakenly wrote the wrong year. Danove argued that she never knowingly signed an arbitration agreement. The court denied the motion, finding that Danove presented sufficient evidence to indicate that the arbitration agreement may not be valid under ordinary contract principles because she may not have "agreed" to it. On October 15, 2012, the court held a one-day bench trial on the validity of the arbitration agreement, and thereafter, counsel submitted post-trial memoranda.

## A.     The Federal Arbitration Act

The Federal Arbitration Act, 9 U.S.C. § 1, et seq., "embodies the national policy favoring arbitration." Buckeye Check Cashing, Inc. v. Cardegna, 126 S.Ct. 1204, 1207 (2006). In determining whether a dispute is referable to arbitration, the court must analyze whether an agreement to arbitrate exists and whether the claim at issue falls within the agreement:

> To ascertain whether the parties have agreed to arbitrate a particular claim, we must determine (1) whether there is a valid agreement to arbitrate between the parties, and (2) whether the dispute in question falls within the scope of that arbitration agreement. In view of the policy favoring arbitration, we ordinarily resolve doubts concerning the scope of coverage of an arbitration clause in favor of arbitration. As a consequence, a valid agreement to arbitrate applies unless it can be said with positive assurance that [the] arbitration clause is not susceptible of an interpretation which would cover the dispute at issue.

Pers. Sec'y & Safety Sys. v. Motorola, Inc., 297 F.3d 388, 392 (5th Cir.2002) (internal citations and quotations omitted). "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." AT & T Techs., Inc. v. Commc'ns Workers of Am., 106 S.Ct. 1415, 1418 (1986). "Normally, doubts must be resolved in favor of arbitration, but the federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties or to a determination of who is bound by the arbitration agreement." Am. Heritage Life Ins. Co. v. Lang, 321 F.3d 533, 537-38 (5th Cir. 2003) (quotations and citations omitted). Instead, the court applies "ordinary contract principles" to determine whether there is a valid agreement to arbitrate and who is bound by it. Id. at 538 (citing Fleetwood Enters. Inc. v. Gaskamp, 280 F.3d 1069, 1073-74 (5th Cir. 2002)).

**B.     Contract Formation**

"A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." LA. CIV. CODE art. 1906. Under Louisiana law, the formation of a valid contract requires: (1) capacity to contract; (2) mutual consent; (3) a certain object; and, (4) a lawful purpose. Id. at 1918, 1927, 1966, and 1971.

In this case, it is undisputed that the Miken and Danove had the capacity to contract. See id. at arts. 24 and 1918 (All persons, natural and juridical, have the capacity to contract). It is also undisputed that the contract at issue concerned a certain object and a lawful purpose, i.e. a dispute resolution policy. See id. at art. 1971 (Parties are free to contract for any object that is lawful, possible and determined or determinable); see also Gunderson v. F.A. Richard & Assocs., Inc., 937 So.2d 916, 920 (La. Ct. App. 2006) (Arbitration agreements are lawful because "both Louisiana and federal law favor arbitration"). The parties dispute whether there was mutual consent.

Consent of the parties to a contract is established through offer and acceptance. Id. at art. 1927. "Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent." Id. Further, "[u]nless otherwise specified in the offer, there need not be conformity between the manner in which the offer is made and the manner in which the acceptance is made." Id.

Under Louisiana law, written acceptance of an arbitration agreement is not required. Marino v. Dillard's, Inc., 413 F.3d 530, 532 (5th Cir. 2005) (citing Hurley v. Fox, 520 So.2d 467, 467 (La. Ct. App. 1988). Indeed, "[a]n [arbitration] agreement may be written and the consent thereto may be made orally or by the action or inaction of the parties, thus no signing of the writing is required."

3

Id. (quoting Hurley, 520 So.2d at 469); see also In re Succession of Taravella, 734 So.2d 149, 151 (La. Ct. App. 1999) ("When an agreement [to arbitrate] lacks a signature, the actions and conduct of the parties, who did not sign, may show the effect or validity of the agreement"). An employee's continued employment after receiving a written arbitration agreement from the employer constitutes acceptance of the agreement. Id.

Miken contends that there was mutual consent because Danove signed the dispute resolution policy and the acknowledgment of receipt of the employee handbook. The employee handbook states that continuing employment with the company constitutes acceptance of the dispute resolution policy.

Danove contends that there was no mutual consent because she did not knowingly sign an arbitration agreement when she applied for work at Miken in January 2011. Danove claims that the signatures on the dispute resolution policy and the acknowledgment of receipt of the employee handbook are forgeries. Danove also claims that, if she did sign the documents, they were in a large stack of documents that Miken presented to her when she was hired, and nobody explained to her that there was an agreement to arbitrate or what arbitration is.

## C. Trial Testimony

### 1. Kimberly Huval

At the trial, Kimberly Huval, the director of staffing for Brock Enterprises, L.L.C., testified on behalf of Miken. Huval testified that Miken and Brock Services, Ltd. are both companies that have been "under the umbrella of The Brock Group" since at least 2010. As the director of staffing for The Brock Group, Huval has personal knowledge of the company's human resources policies and access to the employees' personnel files. Huval testified that The Brock Group keeps electronic

copies of personnel files, and that Miken maintains paper copies of some of the documents in its office in Clute, Texas. However, Huval also testified that Miken does not maintain paper copies of the initial hiring documents, which include the application and the conditional offer of employment documents. Thus, the only record of the signed dispute resolution policy is the electronic copy.

Huval explained that in 2010, The Brock Group worked to have a standard application packet for all companies "under The Brock Group umbrella," and that The Brock Group's standard packet was adopted for Miken in November 2010. This packet included The Brock Group's employee handbook, which was used by Miken, and a separate copy of the company's dispute resolution policy.

Huval further explained that a person seeking employment with Miken would go to one of the staffing centers, which hired for all companies in The Brock Group, where that person would be interviewed and given an application packet. "Once the application packet was reviewed, [and] seemed okay, then they would be made a conditional offer of employment." Thereafter, the applicant would be given the conditional offer of employment packet that contained various forms, and "from there, they would be continued on in the hiring process, registered at the clinic, safety counsel, whatever the requirements were necessary to meet [the] clients' requirements."

Huval testified that the staffing centers were manned by staffing coordinators. The staffing coordinators were responsible for giving the applicant the necessary paperwork, and making sure that the paperwork was completed, signed and dated. The staffing coordinators were also responsible for scheduling applicants for drug tests, and safety courses, and distributing the employee handbook, hire slip, and instructions to the job site. However, Huval testified that the staffing coordinators are not responsible for explaining the documents to the applicants, and that the

5

applicants must read and understand what they are signing. It is not The Brock Group's policy to have the staffing coordinators give legal advice to applicants. There is no time limit for the applicant to complete the paperwork.

After the applicant completes the paperwork, the staffing coordinator is supposed to check to make sure that it was all filled out, and a newly hired employee should not be allowed to report to work if his or her paperwork is incomplete.

Danove applied for work at Miken at The Brock Group staffing center in Baton Rouge, Louisiana, and that the staffing coordinator who handled Danove's application process was Jessica Perez.

Huval identified Danove's Miken personnel file, and her Brock Services personnel file. Huval testified that Danove applied for work at Brock Services on January 5, 2010, and then applied for employment at Miken on January 14, 2011. Huval explained that The Brock Group electronically stores the personnel files separately and that the documents are date stamped when they are entered into the system. Huval testified that the documents associated with Danove's application for employment at Brock Services in 2010 were date stamped by the computer a few days after January 5, 2010, and that the documents associated with Danove's application for employment at Miken in 2011 were date stamped by the computer a few days after January 14, 2011. Huval testified that the date stamping indicates that the documents were not and could not have been intermingled on the system, because a date stamp would indicate when documents were placed into a file. Huval testified that Danove's Brock Services personnel file contains an acknowledgment of receipt of the employee handbook and a dispute resolution policy, both signed by Danove and dated January 5, 2010.

Huval identified documents from Danove's Miken personnel file. First, she identifed, Danove's 2011 W-4 tax form, which Danove signed and dated January 14, 2010, and Danove's 2011 L-4 tax form, which Danove signed and dated January 14, 2010. Huval testified that a prospective employee would not be given a 2011 tax form in 2010. Huval also identified the acknowledgment of receipt of the employee handbook that Danove purportedly signed and dated January 14, 2010, and Jessica Perez initialed and dated January 14, 2011. Further, Huval identified an arbitration agreement that Danove purportedly signed and dated January 14, 2010.

Huval testified that the employee handbook used by Miken in January 2011 was the same handbook that was adopted by The Brock Group in 2008. Huval testified that in January 2011, all employees hired by a Brock Group company, including Miken, were given a copy of the employee handbook, and that an employee should not be permitted to report to work if he or she has not received it.

The Brock Group's dispute resolution policy begins on page 53 of The Brock Group employee handbook. On page 54, The Brock Group employee handbook states:

> All employees of the Company shall be subject to the Company's Dispute Resolution Policy set forth on the following page for resolution of all matters relating to the employee's employment with the Company. This Dispute Resolution Policy shall be mutually binding on the Company and the employee and is a distinct and separate agreement from all other modifiable Company policy provisions. The employee acknowledges that the terms and conditions of the Dispute Resolution Policy has been provided to the employee as a separate document either through notice or as part of the employee's hiring package. In addition, the employee may request a copy of this policy at any time by contacting the Human Resources Department.
>
> The Dispute Resolution Policy is a binding agreement and acceptance and/or continuation of employment with the Company constitutes knowing and voluntary acceptance and agreement to the terms and

>conditions of the Dispute Resolution Policy. The Company hereby advises the employee to consult with legal counsel regarding the consequences of the Company's Dispute Resolution Policy. The Dispute Resolution Policy does not in any way alter the "at will" status of the employment relationship.

Pages 55 through 57 of the employee handbook contain the provisions of the company's dispute resolution policy, which requires binding arbitration of "[e]ach, every, any and all claims, disputes and/or controversies now existing or later arising between or among the Parties, . . ., whether now known or unknown, arising out of or related to employment or termination of employment with The Brock Group," including claims regarding termination or harassment. The dispute resolution policy explains that The Brock Group includes "all current and future, direct and indirect, wholly owned subsidiaries," including Miken Specialties, Ltd.

Huval testified that, according to the provisions on page 54 of The Brock Group employee handbook, an employee knowingly and voluntarily accepts the arbitration agreement by signing the dispute resolution policy or continuing his or her employment with The Brock Group. Huval testified that the dispute resolution policy applies to all employees of The Brock Group companies, and that it creates a mutual obligation between the company and the employee to arbitrate disputes related to the employee's employment.

Huval testified that Miken did not require prospective employees to sign separate copies of the company's dispute resolution policy until mid-November 2010. Thus, any employee hired by Miken prior to mid-November 2010, such as Raul Davila, Sim Leydecker and Felix Echavvari, would not have signed a separate copy of the company's dispute resolution policy, but are bound by it because it appears in the employee handbook that they received, and continued employment constitutes voluntary and knowing acceptance of the dispute resolution policy.

Huval testified that most of the employees that work for The Brock Group as laborers did not complete high school. Huval also testified that she "couldn't speak for the general population" regarding whether such employees would understand the arbitration agreement, and that she does not know what people understand or do not understand. Further, Huval testified that The Brock Group does not offer training regarding the dispute resolution policy, or specifically explain it, because the dispute resolution policy advises employees to seek legal advice and "[t]he expectation is if you don't understand what you're signing you should ask."

Regarding errors on employment application documents, Huval testified that "[t]he expectation is if somebody makes a mistake, you can do one of two things: You can either have a new documentation signed or you can cross out the error, have the applicant initial and date when they made the correction." Huval testified that Perez made a mistake by failing to correct Danove's errors of dating documents in 2011 with 2010.

Huval testified that she did not personally witness Danove sign the dispute resolution policy or receive a copy of The Brock Group employee handbook. However, she did testify that it is standard procedure for all employees to receive a copy of the employee handbook.

### 2. Jessica Perez

The parties offered Perez's deposition testimony in lieu of live testimony. At her deposition, Perez testified that she has worked as "staffing support" taking employment applications for The Brock Group since February 2009. Perez met Danove when Danove applied for employment at Miken on January 14, 2011. Perez testified that she signed the document that "says check app," so she "more than likely, . . . reviewed and made sure [Danove] didn't miss anything."

Perez testified that she did not explain the documents to Danove, and that she does not "explain the documents to anybody," because "[she] can't tell them what to put on it." Instead, Perez "just make[s] sure that everything's filled out," and "that they filled it out correctly." Perez testified that she is "not supposed to explain" the paperwork, and that the applicants "have to sit down and read it." Perez further testified that she was not instructed not to explain the paperwork to applicants.

Perez testified that the W-4 tax form in Danove's Miken file must have been signed in 2011, because the application is changed every year, "[s]o if the year changes, we have to print these with the new year on it." Perez testified that January 14, 2010, date on Danove's 2011 W-4 tax form must have been a mistake that was overlooked by the person that checked the application. Perez explained that if the mistake had been caught, Danove would have been asked to fill out a new W-4 tax form, "because they cannot have mistakes on this form . . . on this one since it's an important document . . . we don't want anybody to get the impression that we changed information for the applicant, so we give them a new one. When it comes to this form and the L4." Perez further testified that the incorrect dates on Danove's other documents must have been overlooked.

Perez testified that she did not witness Danove sign any of the documents because she was "behind a window," and Danove would have been at a desk that was "really far from the windows." Perez also testified that she has no specific recollection of giving Danove a copy of The Brock Group employee handbook. However, Perez also testified that she would assume that she did give Danove an employee handbook "because we would give it to everybody."

Perez also testified that the dispute resolution policy is included in every application packet, and that it is a problem if it is not signed. In that event, the applicant is contacted "to come back and

[Brock] would have pretty much stopped the process. Basically, [Brock] wouldn't let them go to work without having everything - - all the paperwork done in [the staffing] office."

Perez testified that she signed the dispute resolution policy when she began working for The Brock Group, but that she does not understand the meaning of arbitration. Perez further testified that nobody explained it to her, but stated "[t]o be honest, it's my responsibility to read what I'm signing, and if I choose to sign it without reading it, that's my decision." Perez also testified that she has a high school education, but she cannot comment on what someone else might or might not understand, because "everybody's different."

### 3. Raul Davila

Davila testified at his deposition that Miken hired him on September 15, 2010. Davila stated that he did not sign an arbitration agreement with Miken, but that he was given an employee handbook. Davila stated that he had no knowledge of whether Danove signed an arbitration agreement because he has "nothing to do with her paperwork." Davila also testified that to his "knowledge everybody is given a file, a book, a manual. It's a must. . . new hires all have manuals. They all come to [him] with their manual. They are told to hold on to them for at least a month." Davila testified that he has personal knowledge that Danove had an employee handbook because he "see[s] them. When they come to [him] with their papers. [They] go throughout it with the PTSA card, along with [his] supervisors, safety, and [they] go throughout the paperwork. It's something [they] have to see they have it on them. If not they are not to go to the unit or [they] give it to them."

### 4. Jovan Danove

Danove testified that she did not complete high school, but that she can read and write. Danove testified that when she applied for work at Miken in January 2011, there were five or six

11

women behind the glass at the staffing center, that she filled out an employment application and other paperwork, and had to take a safety class and drug test that same day. Danove testified that there was a lot of paperwork.

Danove testified that, when she applied for work at Miken in January 2011, she did not sign the dispute resolution policy, that she did not realize that she signed a dispute resolution policy, and that nobody explained the dispute resolution policy to her. Further, Danove testified that there was no training regarding the dispute resolution policy, and that she does not understand it. Danove admitted that she did sign a dispute resolution policy when she applied for work at Brock Services in January 2010.

Danove testified that she did not receive and employee handbook when she applied for work at Miken in January 2011, and that she did not receive an employee handbook when she applied for work at Brock Services in 2010.

Danove admitted that she testified at her deposition that people will occasionally write the wrong date at the beginning of the calendar year. However, she testified that she is "[o]ne hundred percent positive" that she could not possibly have written the wrong date when she applied for work at Miken in January 2011. Danove testified that there was nobody standing over her rushing her when she filled out the paperwork, but that she also had to take the safety class and drug test the same day.

**5. Cynthia Rogers**

Miken offered, and the court accepted, Cynthia Rogers as a handwriting expert.[1] Rogers testified that she examined Danove's known signatures, i.e. the ones that Danove admits are authentic, against the signatures on the dispute resolution policy and the acknowledgment of receipt of the employee handbook, both of which are dated January 14, 2010. Rogers testified, that although it is better to have an original document, the available copy was sufficient for her examination. Rogers testified that the questioned signature and the known signatures "start close to the baseline, but elevate higher to the right." Rogers also testified that the connections between the letters and size were basically the same in all of the signatures, and that the beginnings of the letters an endings of the strokes, as well as the alignment, were identical. Further, Rogers testified that, under microscopic examination, she could see that some of the signatures exhibited a "specific idiosyncracy" that she called a "twisted 'J'", which she testified is "a very difficult stroke for an individual to construct." Rogers opined that "a lot of the variation depended upon where [Danove] was writing."

Rogers explained that the letters of Danove's signature are like tiny bumps or "little ascensions that travel across," as if "letters are trying to be formed but they don't." Rogers opined that Danove's signature "would be very difficult for someone to forge or trace because the count number on the little ascensionis are just about the same in all of the signatures."

Rogers also compared the numbers that formed the dates that appeared with the signatures. Rogers testified that the "1" and the "14" are identical in all of the signatures. Rogers explained that

---

[1] In her post-trial memorandum, Danove questions Rogers' qualifications and attempts to offer evidence on the matter. This evidence was not part of the trial record, and therefore will not be considered. Further, Danove traversed Rogers regarding her qualifications before the court accepted Rogers as a handwriting expert.

the "4s" begin "with a slight little hook, which, again, too, is a definite idiosyncracy of Ms. Danove." Thus, Rogers opined that Danove "not only wrote her name on the questioned documents, she also wrote the dates on those documents."

### 6. Mary Ann Sherry

Danove offered, and the court accepted, Mary Ann Sherry as a handwriting expert. Sherry testified that she was presented with the signature on the dispute resolution policy dated January 14, 2010, as the signature in question. Sherry testified that she requested an original because she did not find the copy to be of sufficient quality to conduct her examination. Sherry testified that she was not asked to examine the signature on the acknowledgment of receipt of the employee handbook dated January 14, 2010.

Sherry testified that she compared the questioned signature to known examples of Danove's signature. Sherry testified that she agreed with Rogers that the signature goes over the baseline. However, Sherry found that the "J" was taller than in the known examples, and that it was "not as smooth as [she] would expect it to be." Further, Sherry testified that at the end of the signature, "usually what Ms. Danove does is sometimes she writes in her letters, sometimes she doesn't. She just makes a little wavy line and it goes outward." Sherry found that the end of the questioned signature did not go outward, instead it "sort of stops and adds on," and that it was not tapered, which would have indicated that it was signed quickly meaning it was more likely to be genuine. Sherry thought she would be able to see such details on a clearer photocopy or the original document. Therefore, in Sherry's opinion, her findings as to whether the signature on the questioned dispute resolution policy was Danove's is inconclusive. Sherry stated that she "couldn't tell whether

14

it was a simulation [that] would be maybe it was drawn or copied off of one of the other ones," or "if it was just a difference, a little difference in the way [Danove] did it."

**D.    Analysis**

The trial testimony establishes that Danove did consent to the dispute resolution policy. Under Louisiana law, a person who alleges that her signature is a forgery bears the burden of proof. Coleman v. Egle, 376 So.2d 983, 985 (La. Ct. App. 1979). Further, "[a] person who signs a written instrument is presumed to know its contents and cannot avoid [her] obligations by contending that [she] did not read it, or that it was not explained or that [she] did not understand it." Williams v. Interstate Dodge, Inc., 34 So.3d 1151, 1156 (La. Ct. App. 2010).

Danove has not proved that the signatures on the dispute resolution policy and the acknowledgment of receipt of the employee handbook are forgeries. Danove testified that she is "one hundred percent" sure that she did not sign those documents. However, there is no evidence to corroborate Danove's testimony.

Danove's handwriting expert, Sherry, testified that her finding as to whether the signature on the dispute resolution policy was a forgery is "inconclusive," and she was not asked to examine the acknowledgment of receipt of the employee handbook. Sherry testified that she needed a clearer copy or the original of the dispute resolution policy to conduct a proper examination. Danove contends that Miken has not adequately explained what happened to the original copy of the dispute resolution policy, and that it should be presumed that it was destroyed because it was a forgery. However, at trial, Huval explained that Miken does not keep paper copies of the original hiring documents, which includes the signed dispute resolution policy and the acknowledgment of receipt

of the employee handbook. Therefore, it will not be presumed that it was purposely destroyed to hide a forgery.

Indeed, Miken's handwriting expert, Rogers, testified that the copies of the signed dispute resolution policy and acknowledgment of receipt of the employee handbook were sufficient for her to perform her analysis. Rogers testified that the questioned signatures on the dispute resolution policy and the acknowledgment of receipt of the employee handbook are not forgeries and that Danove dated the documents because of specific idiosyncracies in her formation of the number "4."

Huval explained Miken did not begin using the stand alone dispute resolution policy document until November 2011, and that the documents from Danove's 2010 Brock Services personnel file and Danove's 2011 Miken personnel file could not have been mixed because of the date stamps in the computer filing system. Huval also testified that all employees receive a copy of the employee handbook, which contains a copy of the dispute resolution policy. Huval testified that all employees are bound by the dispute resolution policy because it is in the employee handbook and continuing work constitutes acceptance of the policy. Further, Perez and Davila testified that they are positive that Danove received a copy of the employee handbook because all employees receive a copy of the employee handbook. Thus, Danove's contentions that she did not receive the employee handbook, and that the questioned documents were actually signed in 2010 in connection with her employment with Brock Services and later placed into her Mike personnel file, are not plausible.

Further, Huval and Perez testified that the staffing coordinators do not explain the documents to the prospective employees, but rather that the prospective employees are expected to read the documents and ask questions if they do not understand something. Perez testified that nobody told

her not to explain the documents, but that it is the prospective employee's responsibility to read the documents before signing them. Huval testified that the dispute resolution policy advised the prospective employee to seek legal advice if necessary, and that there was nothing to prevent Danove from doing so if she desired. It is presumed that a person has read and understood a document she has signed, regardless of whether it was explained to her. Williams, 34 So.3d at 1156. As explained above, it is apparent that Danove signed the dispute resolution policy. Thus, she is deemed to have understood it.

Because Danove did not prove that the signatures were forgeries, and is deemed to have read and understood the dispute resolution policy, she is bound by it. Therefore, this matter must be referred to arbitration.

## CONCLUSION

On the basis of the above Findings of Fact and Conclusions of Law, the court finds that Danove is obligated to arbitrate her claims against Miken. Accordingly, Danove is ordered to pursue her claims against Miken in binding arbitration, and this matter is hereby **STAYED** until arbitration is complete.

New Orleans, Louisiana, this  13th  day of December, 2012.

_____
**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**